## 49573. JACIEWICKI et al. v. GORDARL ASSOCIATES, INC.

STOLZ, Judge.

June C. Jaciewicki and M. Patricia Rice (plaintiffs) brought suit in the State Court of DeKalb County against Gordarl Associates, Inc., a corporation (defendant), alleging that each plaintiff, for a stated sum of money, had entered into a "Distributor Agreement" with the defendant; that the agreement (copies of each were attached to the complaint) comes under the definition of "Security" as defined in Code Ann. § 97-102 (i) (Ga. L. 1957, pp. 134, 135; as amended); that the defendant has not registered and complied with Code Ann. §§ 97-104 and 97-105 (Ga. L. 1957, pp. 134, 138, 143, as amended) (Commissioner's Certificate of Non-Compliance attached to complaint); that the defendant had failed and refused to comply with Code Ann. § 97-114 (Ga. L. 1957, pp. 134, 161) permitting the rescission of such unregistered transactions and demanding a money judgment in the amount paid for the "Distributor Agreements," plus interest, costs and reasonable attorney fees. The defendant admitted the existence of the "Distributor Agreements," and the fact that it had not registered any securities within the State of Georgia, but contended that it was not required to do so because the "Distributor Agreements" were not securities within the meaning of the applicable law.

Under the "Distributor Agreements," each of the plaintiffs became wholesale distributors for the sale of products created and manufactured by Stacy's, Inc. (the defendant being Stacy's, Inc.'s exclusive marketing representative). The defendant was to obtain a number of suitable retail locations in specified areas and provide the plaintiffs with information and instructions covering all phases of the business. Other than the consideration paid for the "Distributor Agreements," the only investment made by the plaintiffs consisted of the purchase of merchandise from the company. The investment was to be returned to the plaintiffs in the

form of a 20% special rebate on subsequent merchandise orders. The plaintiffs could sell only merchandise; their respective "Distributor Agreements" could only be sold with prior written consent of the defendant. The profits made by the plaintiffs were to come from their respective sales (45% of the wholesale price of merchandise sold). The plaintiffs were not to participate in the defendant's profits or losses. The plaintiffs had no voice in the management of the defendant company. The "Distributor Agreements" did provide that the defendant would furnish each plaintiff with a specified number of suitable retail locations; also detailed information and instructions covering all phases of the new business, point-of-sale promotion to stimulate retail sales, printed material/forms, and new products as they are made available from time to time.

The sole issue to be determined is whether the "Distributor Agreements" herein are within the definition of the word "security" under the applicable provision of our statutes. The trial court held that they were not, denied the plaintiffs' motion for summary judgment, and sustained the defendant's motion for summary judgment, from which the plaintiffs appeal. *Held:*

The "Distributor Agreements" in question were entered into on November 28 and 29, 1972.

The Georgia Securities Act of 1957, § 1 (i) (Ga. L. 1957, pp. 134, 136; Code Ann. § 97-102 (i)) defined "Security" as "any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of indebtedness, investment certificate, certificate of interest or participation, certificate of interest in oil, gas or other mineral rights, collateral trust certificate, preorganization certificate or subscription, transferable share, *investment contract,* voting-trust certificate or beneficial interest in title to property, profits or earnings, or *any other instrument commonly known as a security,* including any guarantee of, temporary or interim certificate of interest or participation in, or warrant or right to subscribe to, convert into or purchase, any of the foregoing. 'Security' shall not mean any insurance or endowment policy or annuity contract under which an

insurance company promises to pay a fixed number of dollars either in a lump sum or periodically for life or some other specified period." (Emphasis supplied.)

In 1970, the General Assembly amended the foregoing definition of "Security" by striking the same in its entirety and substituting in lieu thereof the following: "(i) 'Security' shall mean any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of indebtedness, investment certificates, certificate of interest or participation, certificate of interest in oil, gas, or other mineral rights, collateral trust certificate, preorganization certificate or subscription, pre-incorporation certificate or subscription, transferable share, *investment contract,* voting-trust certificate, or *beneficial interest in title to property, profits or earnings, or any other instrument commonly known as a security,* including any guarantee of, temporary or interim certificate of interest or participation in, or warrant or right to subscribe to, convert into or purchase, any of the foregoing. . . 'Security' shall not mean any insurance or endowment policy or annuity contract under which an insurance company promises to pay a fixed number of dollars either in a lump sum or periodically for life or some other specified period, nor to any variable annuity contract as provided for and regulated under the Georgia Insurance Code and issued by a life insurance company licensed to do business in the State of Georgia." (Emphasis supplied.) Ga. L. 1970, p. 450.

The Georgia Securities Act of 1957 as amended (including the aforesaid 1970 amendment) was repealed by the Georgia Securities Act of 1973 (Ga. L. 1973, p. 1202 et seq.; Code Ann. § 97-101 et seq.). The rights of the parties must be determined on the dates the "Distributor Agreements" were entered into, November 28 and 29, 1972. Hence, the definition of "Security" as found in Ga. L. 1970, p. 450, is applicable.

The Acts of 1957, 1970 and 1973 each contain the language "investment contract" and "any other instrument commonly known as a security" as part of the definition of "security." These terms appear in the federal securities acts and the securities acts of many

states. Many formulae and tests have been devised and applied to determine if a "security" exists in a particular factual situation. These may be briefly summarized as follows:

(a) The "Joiner" test, as developed in SEC v. C. M. Joiner Leasing Corp., 320 U. S. 344 (63 SC 994, 87 LE 1129) (1943), in which a "security," "investment contract" or "any interest or instrument commonly known as a security" was to be based on "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." Id., p. 352.

(b) The "Howey" test, expressed in SEC v. W. J. Howey Co., 328 U. S. 293 (66 SC 1100, 90 LE 1244, 163 ALR 1043) (1946) as "an investment contract for purposes of the Securities Act means a contract, . . . whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . ." Id., pp. 298-299. The Howey test was applied in Georgia in *Ga. Market Centers, Inc. v. Fortson,* 225 Ga. 854, 858 (171 SE2d 620), and was found to be "a workable formula to use in testing whether a contract of the type under consideration here is subject to regulation by the Commissioner of Securities of Georgia." The Supreme Court went on to state, "However, we would not mean to infer that this definition should be adhered to with such strictness that a mere token participation in an enterprise by the person investing capital would prevent the contract from being classed as a security. In testing any transaction, 'form should be disregarded for substance and the emphasis should be on economic reality.' Tcherepnin v. Knight, 389 U. S. 332, 336 (88 SC 548, 19 LE2d 564)." Id., p. 858. In SEC v. Koscot Interplanetary, Inc., 497 F2d 473 (5th Cir., 1974), the U. S. Court of Appeals for the Fifth Circuit construed the third element of the Howey test — "solely from the efforts of others" — in a broad sense, rather than literally, citing the holding that the critical inquiry is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise" (Id., p. 483 and cit.), and noted

that "[a] literal application of the Howey test would frustrate the remedial purposes of the Act." Id., p. 480.

(c) The "Risk Capital" test, as originally developed by former Chief Justice Traynor of the California Supreme Court in Silver Hills Country Club v. Sobieski, 361 P2d 906 (1961), where promoters were "soliciting the risk capital with which to develop a business for profit . . . Only because he [the investor] risks his capital along with other purchasers can there be any chance that the benefits of club membership will materialize." Id., p. 908.

The "risk capital" test was used by the Court of Appeals of Oregon in State ex rel. Healey v. Consumer Business System, Inc., (Ore. App.) 482 P. 2d 549, in adjudicating a franchise scheme to be within the definition of an "investment contract" (hence a security) under the Oregon security law. The Oregon Court of Appeals noted that the Howey test, supra, was not exclusive and that the "risk capital" test can also "be used in determining whether a particular financial activity constitutes an offer of [a security] which must be registered." Id., p. 554. The Oregon appellate court went on to quote approvingly the trial court's oral opinion in part, that "the courts are not concerned so much with whether the investor derives his profit solely or substantially from the efforts of others, but rather with whether the franchisor is depending on the investor for a substantial portion of the initial capital needed to start the enterprise." Id., p. 555.

(d) The "Managerial Efforts" test, as stated in SEC v. Glenn W. Turner Enterprises, Inc., 474 F2d 476 (1973), where contracts characterized as self-improvement courses, which were sold to the public, were held to be "investment contracts" and hence securities under the federal securities law. Under this test, a security is found "[r]egardless of the fact that the purchaser . . . must contribute something besides his money, [because] the essential managerial efforts which affect the failure or success of the enterprise are those of [the seller], not his own." Id., p. 483.

The foregoing tests are not exclusive of each other. Thus, a factual situation which falls within the framework of either of the tests, or any combination

thereof, will afford sufficient basis for a finding that a "security" is involved within the meaning of the statute. In *Ga. Market Centers, Inc. v. Fortson,* 225 Ga. 854, 858, supra, the Supreme Court, in applying the Howey test, found it to be *"a workable formula to use . . ."* (Emphasis supplied.)

In the record before us, we have only the complaint with its exhibits, the defendant's answer, and one affidavit in support of the defendant's motion for summary judgment. The plaintiffs' exhibits show that the defendant "is solely engaged in the business of appointing and establishing independent distributors for the sale of the products created and manufactured by Stacy, Inc., a wholly owned subsidiary of Weingeroff Enterprises, Inc." While the affidavit given in support of the defendant's motion for summary judgment, states that the plaintiffs' profits would result only from their own efforts, that the plaintiffs had no right to participate in the defendant's profits, and that the plaintiffs had no voice in the defendant's management, these bare statements do not satisfy as a matter of law the *tests* previously set forth. For instance, the record is silent as to whether the funds paid to the defendant by the plaintiffs are used to establish the defendant's business as a franchisor, or the type of representations that were made to the plaintiffs in connection with their respective purchases, or the importance of the "requisite suitable retail locations" to be secured by the defendant for each plaintiff, or the various other acts to be performed by the defendant under the "Distributor Agreement."

The Georgia securities laws are an expression by the General Assembly of a statutory policy affording broad protection to investors, and are not merely hurdles which are devised to challenge the ingenuity of sophisticated corporate counsel. They are remedial in nature and thus should be liberally construed. SEC v. Koscot Interplanetary, Inc., 497 F2d 473, supra, pp. 479-480. The matter before us is here on appeal from the grant of the defendant's motion for summary judgment and the denial of the plaintiffs' motion for summary judgment. As such, the opposing party is given the benefit of all reasonable doubts and all favorable inferences that may

be drawn from the evidence. *Holland v. Sanfax Corp.,* 106 Ga. App. 1 (126 SE2d 442). The record before us simply does not reveal that there are no genuine issues as to any material fact and that either party is entitled to a judgment as a matter of law. Code Ann. § 81A-156 (c).

The trial judge correctly denied the plaintiffs' motion for summary judgment, but erred in granting that of the defendant.

*Judgment reversed. Eberhardt, P. J., and Deen, J., concur.*

ARGUED SEPTEMBER 5, 1974 — DECIDED OCTOBER 11, 1974.

*Ginsberg & Smith, Charles D. Smith,* for appellants.
*Katz, Paller & Land, Fred L. Cavalli,* for appellee.
*Arthur K. Bolton, Attorney General, Daniel I. MacIntyre, Assistant Attorney General,* amicus curiae.