## 52066. PEOPLES BANK OF LaGRANGE v. NORTH CAROLINA NATIONAL BANK.

WEBB, Judge.
In this action by North Carolina National Bank against Peoples Bank of LaGrange, Carolina seeks

recovery from Peoples of $50,000 plus interest that Carolina had lost because of allegedly false and fraudulent representations made to it by Peoples. The pith of Carolina's claim is that it was induced by Peoples to deposit to the latter's credit $50,000 for a note signed by L. C. Robinson & Sons, Inc. and endorsed by G. E. Robinson, both customers of Peoples. Three days after the deposit to its account, Peoples withdrew this amount from its account.

Peoples denied substantially all of the allegations of the complaint, and filed a cross claim against Carolina. The latter's motion to strike the cross claim was sustained, and there was no appeal. Peoples' motion to require Carolina to join as parties defendant the Robinson corporation and Gerson E. Robinson was sustained and they were ordered joined as parties defendant. This order was reversed on appeal.[1]

Robinson's note was transmitted by letter from B. D. Bray as president of Peoples to Richards Roddey as vice president of Carolina. Written on September 28, 1970, the date of the note, the letter read in part: "I am enclosing a note that I wish you would handle for 30 days with a renewal of 30 additional days if necessary at maturity. This time of the year this particular customer borrows our limit from us and we have to try to secure additional funds for him since this is the time of year when his work is the best. His volume for September, October, November and December should be approximately $100,000 per month. He does Interstate hauling both in Georgia and South Carolina and both states take their time about paying the prime contractor. All the work is bonded therefore we do not hesitate to recommend this loan to you. If you can handle it, we intend to leave the money on deposit with your bank until the loan is paid and possibly even longer depending on the money market. I will forward to you a resolution and financial statement as soon as we get a new one. I checked the files and our's is out of date. Incidentally, we have assignments on all the work

[1] *N. C. Nat. Bank v. Peoples Bank of LaGrange,* 127 Ga. App. 372 (193 SE2d 571); s.c. 230 Ga. 389 (197 SE2d 352).

performed and to be performed for Mr. Robinson. Mr. Robinson, who is president and owner, has endorsed the note and his net worth is approximately $150,000." The note was on a Peoples bank form with its name "X'ed" out and Carolina's name inserted.

At the request of Carolina the deposition of G. E. Robinson was taken on February 17, 1972. Interrogatories to Peoples were answered on February 22, 1972, and interrogatories to Carolina were answered on March 20, 1972.

Peoples' answers to Carolina's interrogatories were made by Thomas Sheffield, a successor to Bray as Peoples' president. Sheffield said that Bray's employment terminated November 10, 1970; Robinson first became indebted to Peoples on February 28, 1968; Robinson's debt to Peoples increased to a high of $142,331.46, including overdrafts of $74,750.04, on September 1, 1970; his bank's legal debt limit to Robinson was $135,000 secured; in April of 1970 Peoples became aware that the line of credit extended to Robinson was excessive and instructed its officers not to lend any more money to Robinson without proper collateral; Robinson's account was credited with loan proceeds of $50,000 on September 14, 1970 on the assumption that Fulton National Bank would take that loan, but Fulton refused "to make the loan"; it was not until September 28 that the transaction with Carolina took place; "at the September 15, 1970 meeting of the Executive Committee of the Board of Directors, a loan to L. C. Robinson & Sons, Inc. made by Peoples Bank was read out and the committee refused to approve said loan. At said meeting a motion was passed directing B. D. Bray not to make any more loans to L. C. Robinson & Sons, Inc. or to Gerson E. Robinson. Neither the Executive Committee nor Board knew anything about any loan made by other banks to L. C. Robinson & Sons, Inc. until about October 28, 1970 when the State Banking Department auditors reported some loans made by other banks to L. C. Robinson & Sons, Inc. We were also advised that Fulton National Bank had refused a loan to L. C. Robinson & Sons, Inc"; and Bray as president of Peoples had, prior to September 28, 1970, made a loan to Robinson which had not been approved by the Executive

Committee.

Significantly, in answer to Carolina's request of Peoples for the "name, address and telephone number of *every* person who has any knowledge of circumstances surrounding the execution of the note" for $50,000 from Robinson which Peoples sent to Carolina, and "who has any knowledge of dealings, transactions or other connections between L. C. Robinson & Sons, Inc., B. D. Bray, Peoples Bank of LaGrange and North Carolina National Bank, Georgia Bank and Trust Company and First National Bank of Newnan," Sheffield named three individuals, B. D. Bray, Richards Roddey and G. E. Robinson.

Interrogatories propounded by Peoples to Carolina were answered by Roddey and Francis B. Kemp. These two categorically asserted some 18 or more times that Robinson's note for $50,000 was purchased by Carolina from Peoples; that credit information was given by Peoples through its president, Bray; Peoples made the loan initially and the credit check; the assignment of contract rights as security for the note was represented to be existing at the time of the purchase of the note by Carolina; Peoples "represented that it had such assignment which was held for" Carolina by Peoples; Carolina made no loan to Robinson but purchased a note from Peoples; the note was treated as a secured note; the note prepared by Peoples indicates that it is secured; "the president of a correspondent bank is generally a reliable source of credit information especially as to customers of the bank supplying credit information"; the loan was made by Peoples and purchased by Carolina from Peoples who "represented that it had such information as is believed necessary to recommend this purchase"; and both they and Carolina "consider it to be good banking practice to accept, as the basis of the purchase of a note, credit information supplied by the president of a correspondent bank. This is especially true where the borrower or maker of a note is a regular customer of the correspondent bank, for in such cases the correspondent bank would be the most reliable source of credit information."

Robinson testified in his deposition that Bray prepared the notes to be signed, "a lot of times I'd go by and

sign a note and the money was deposited right then into the account, but then — I don't know just how — what — how things operate, but I'd sign a note and he had to get approval, or either he had to go to another bank to get it handled, or whatever he had to do, and whoever was handling it, the money was deposited. I may or may not have been around when it was done"; sometimes Bray would call him to come by and sign a note; when he executed the note on September 28, it was payable to Peoples, and the payee had not been "X'ed" out with the name "North Carolina National Bank" inserted; he had never heard of North Carolina National Bank until he received a due notice on the note; nobody from the Carolina Bank was present at the time the note was executed; he did not receive a check for $50,000 at the time he signed the note, he did not receive any cash, he has not deposited this $50,000 into his account at Peoples and does not know what happened to the money; he had examined his deposit slips at Peoples and did not find that this money was deposited to his account at Peoples.

Robinson further testified that in September of 1970 he didn't know how much his company owed, "probably two or $300,000"; all of its and his property was mortgaged; his company had overdue notes and bills which it could not pay; he was personal endorser on notes to Peoples totaling $58,000 or $64,000 on October 1, 1970; he was then endorser on a note for $40,000 at First National Bank of Newnan; he had a note at Georgia Bank & Trust Company in Macon for around $50,000 or $40,000; he owed Fulton National Bank $20,000; he was endorser on a note at Central Bank and Trust Company in Birmingham for $45,900; these notes, except the Macon note, were L. C. Robinson and Sons, Inc.; the corporation was not able to pay off these notes, and he was not able to pay them off personally; at the time of his deposition (February 17, 1972), his company had no property other than five trucks worth approximately $3,000 each, and the company owes as much as $100,000; Peoples had foreclosed and bought in his property; when all was sold and the proceeds applied to his obligations, all were not paid off in full; he still owes a large amount of money; he wouldn't think he was worth $150,000 at the time Bray

wrote Carolina; all contract rights with Southeastern Highway were assigned to Peoples, and none to Carolina; he owed more money than he can pay; he owed more than the property he owned would sell for; it was a short period of time after September 28, 1970 "that we couldn't pay, that we couldn't pay off, and we were called on to pay, that's the only thing I can base it on that we were not worth that much."

From the exhibits identified by Robinson and attached to his deposition, the bank statement of the checking account of L. C. Robinson and Sons for the period beginning September 1 and ending September 29, 1970 shows overdrafts continuously during the first fourteen days of the month ranging from $8,886.73 to $18,748.35. On September 14 apparently deposits were entered for $18,833.62, $30,000, $50,000, $50,000 and $20. After those five entries the company's balance was $13,997.68 but the next day the account reflected an overdraft of $15,875.82. One of the deposits for $50,000 indicated Fulton National. The source of the other $50,000 on September 14 is not identified. The deposit of $18,833.62 was a check from Southeastern; the deposit of $30,000 was marked GB&T on the certificate. On the 14th there were charges against the account of $46,686.25 for "Loan participation Ga. Bk. & Trust Co." and $40,300 for "Loan participation Fulton." There was not on the September bank statement an entry of a $50,000 deposit on or about the 28th —, nor does any such entry appear on the October bank statement.

Roddey and Robinson were two of the three individuals named by Peoples as having knowledge of dealings, transactions, circumstances or other connections relative to the note involved. There is no testimony by the third individual, Bray.

In November and December of 1973 both parties filed motions for summary judgment. Two years later Carolina's motion for summary judgment was granted and it is from this judgment that Peoples appeals.

1. Peoples contends that the court erroneously ruled that there was a sale of the note. Quite obviously Peoples refers to the first conclusion of law by the trial court wherein it adjudged the transaction to be a sale within the

provisions of the Securities Act of 1933. 15 USCA § 77a.

The Securities Act of 1933 makes it "unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly . . . (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 USCA § 77q. Such offeror shall be liable to the purchaser, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid with interest thereon. Ibid, § 77 l.

This Act by its definitions designates "note" as the very first security. Ibid, § 77b(1).[2] The ordinary terms of "any note" or "evidence of indebtedness" are self-defining and require no further definition. Farrell v. United States, 321 F2d 409, 417 (9th Cir. 1963), cert. denied, 375 U. S. 992 (84 SC 631, 11 LE2d 478). And "any note, regardless of its nature, terms or conditions, is fully subject to whatever antifraud provisions are included" in the Act. Sanders v. John Nuveen & Co., 463 F2d 1075, 1078 (7th Cir. 1972), cert. denied, 409 U. S. 1009 (93 SC 443, 34 LE2d 302).

Did Peoples "sell" the note within the meaning of the Securities Act?

Definition Number 3 of the Act provides in part: "The term 'sale' or 'sell' shall include every contract of sale *or disposition* of a security or interest in a security, *for value* . . ." Ibid, § 77b(3) (Emphasis supplied.) These terms "sale" and "security" are to be given a liberal construction. United States v. Monjar, 47 FSupp. 421, 426 (D.C. Del. 1942), affd. 147 F2d 916, cert. den. 325 U. S. 859 (65 SC

[2]Also defined as such in Georgia Securities Act of 1957 (Ga. L. 1957, pp. 134, 136, § 1(i)) and Georgia Securities Act of 1973 (Ga. L. 1973, pp. 1202, 1208, § 2 (16), Code Ann. § 97-102 (16)). See Sobieski, *What is a*

1191, 89 LE 1979).

The term "sale" or "sell" is not limited to technical common-law sales, or transactions ordinarily governed by the commercial law of sales. Spector v. L. Q. Motor Inns, (CA 5th, 1975), 517 F2d 278, 286; Dasho v. Susquehanna Corp., 380 F2d 262 (7th Cir.), cert. den. 389 U. S. 977 (88 SC 480, 19 LE2d 470) (1967). Here the note was created at the instance of Peoples in its place of business, disposed of by mail for value, and $50,000 was credited to its account by Carolina. On questioning by Peoples' attorney, Robinson was asked if he approved of the "assigning" of the note, and he said he did. Robinson testified, "Even though I didn't know what bank he was going to, I signed the note and then he found a bank that would do business with him." The note was transmitted by mail from LaGrange, Georgia to Charlotte, N. C. and thus in interstate commerce; its acceptance and purchase by Carolina was based upon Peoples' letter of transmittal; the letter contained untrue statements of material facts, and omitted material facts; and Peoples failed to show that it did not know these misrepresentations and omissions.

Lehigh Valley Trust Co. v. Central Nat. Bank, 409 F2d 989 (C.A. 5th 1969), is quite similar to this case. A development corporation attempted to negotiate a loan of $325,000 from Central Bank, and Central being able to lend only $185,000 agreed to help by selling participation interests. Central Bank informed Lehigh Trust, among other things, that the guarantor was a "good customer of our bank, had been for a long time and . . . was all right," but failed to report some adverse information. The court held the participation agreement between the two banks to be within the security category, that the misleading information was dispensed "in connection with the purchase or sale" of the loan participation in interstate commerce, and Lehigh Trust having been damaged

---

*Security,* 25 Mercer L. Rev. 381 (1974); Lipton & Katz, *"Notes" Are (Are Not?) Always Securities – A Review,* 29 Bus. Law. 861 (1974), 30 Bus. Law. 763 (1975). For tabulations of cases holding "notes" to be "securities," and "notes" not to be "securities" see 30 Bus. Law. 770, 771.

thereby had a cause of action against Central Bank. In the case before us there was no sale and purchase of a participation in a loan, but rather the entire note or security was sold and bought.

The trial court correctly adjudged the transaction to be a sale within the terms of the Act.

2. There is no merit in the contention by Peoples that its president, Bray, had no authority to bind the bank and that this question was within the province of a jury. Assuming arguendo that Bray lacked proper specific authority to bind the bank, his acts were within his apparent authority as president, it is uncontradicted that the purchase price of the note was paid by Carolina to Peoples by a deposit to the latter's account, and Peoples had the benefit of the proceeds.

"The president of a bank is its chief executive officer, and, in the absence of any showing to the contrary, will be presumed to be the agent in charge of its affairs. In the absence of any evidence to the contrary it may very properly be assumed as a matter of law that it is the duty of the president of a chartered bank to take charge of and manage its business. He is in legal contemplation its alter ego." *Park v. Cordray,* 20 Ga. App. 35 (92 SE 394); *Franklin Savings & Loan v. Branan,* 54 Ga. App. 363, 366 (188 SE 67).

Where, as here, Peoples has obtained the benefits of the transaction, $50,000 credited to its account by Carolina, withdrawn by Peoples and deposited to its account at Fulton National, Carolina may maintain its action on the original transaction against Peoples. *Rowland v. Farmers Bank of Canon,* 52 Ga. App. 50 (182 SE 81); *Bacon v. Dannenberg Co.,* 24 Ga. App. 540 (101 SE 699).

3. Peoples further contends that Carolina "could have, by the exercise of ordinary care and usual banking practices, ascertained the financial condition of L. C. Robinson & Sons, Inc."

The Securities Act was intended to relieve a purchaser from the common-law obligation of using reasonable prudence. "In response to a Presidential message urging that there be added to the ancient rule of caveat emptor the further doctrine of 'let the seller also beware,' Congress passed the Securities Act of 1933.

Designed to protect investors, the Act requires issuers, underwriters, and dealers to make full and fair disclosure of the character of securities sold in interstate and foreign commerce and to prevent fraud in their sale. To effectuate this policy, § 12(2) [Ibid, § 77l] created a special right to recover for misrepresentation which differs substantially from the common-law action in that the seller is made to assume the burden of proving lack of scienter. The Act's special right is enforceable in any court of competent jurisdiction — federal or state — and removal from a state court is prohibited . . ." Wilko v. Swan, 346 U. S. 427, 430 (74 SC 182, 98 LE 168) (1953).

Peoples never contended it had lack of knowledge of the truth about Robinson's financial condition. On the contrary, Peoples' own evidence showed that its directors and president did know. Carolina showed that it relied on Peoples' representations, and does not have to prove that it could not have discovered the falsity upon reasonable investigation. Gilbert v. Nixon, 429 F2d 348, 356 (C.A. 10th, 1970). This enumeration of error is without merit.

4. All other enumerations of error either have already been covered or are without merit.

*Judgment affirmed. Bell, C. J., Deen, P. J., Clark, Stolz, Marshall and McMurray, JJ., concur. Pannell, P. J., concurs in the judgment only. Quillian, J., dissents.*

SUBMITTED APRIL 13, 1976 — DECIDED JULY 9, 1976 — REHEARING DENIED JULY 23, 1976 —

*Richter & Birdsong, A. W. Birdsong, Jr.,* for appellant.

*Duncan & Thomasson, Thurman E. Duncan,* for appellee.

QUILLIAN, Judge, dissenting.

The trial court and the majority opinion have ruled that the transmittal of a note with a letter from the LaGrange Bank to the North Carolina Bank was the sale of the note. There is evidence to sustain this proposition. However, we are considering this matter on motion for summary judgment.

The note is made out to the North Carolina Bank and signed by L. C. Robinson and Sons, Inc., by G. E. Robinson, President. The note shows on its face that it is a loan made by the North Carolina Bank to L. C. Robinson and Sons. The majority opinion construes the evidence to show that it is a note made to the LaGrange Bank and then sold to the North Carolina Bank. I cannot agree with this reasoning. The letter addressed to the North Carolina Bank bears out the fact the parties contemplated that the North Carolina Bank would loan the money, not purchase the note from LaGrange Bank. It states: "This customer [has borrowed] our limit from us. I wish you would handle" it for "we have to try to secure additional funds for him . . ." "We . . . recommend this loan to you . . . if you can handle it . . ." Both the note and letter show an intent of the LaGrange Bank to secure a loan from the North Carolina Bank to Robinson, not a sale of a note from Robinson to the LaGrange Bank, discounted to the North Carolina Bank.

Further, it should be observed that the North Carolina Bank wrote to the LaGrange Bank as follows: "We are also pleased to handle a loan to L. C. Robinson and Sons, Inc., endorsed by Mr. Robinson for thirty days with the understanding that we will handle another thirty day renewal if necessary as an overline for your bank." The most reasonable construction of this correspondence is that the North Carolina Bank was making a loan to the LaGrange Bank's customer. The note itself contains no indorsement, assignment or transfer from the LaGrange Bank. If we follow the majority reasoning, the sale was accomplished by changing the name of the payee, most certainly not an acceptable business practice. See UCC §§ 8-307 and 8-308 (Ga. L. 1962, pp. 156,367) for the indorsement and transfer of investment securities. See and compare UCC §§ 3-201, 3-202 (Ga. L. 1962, pp. 156, 248) setting out the transfer and negotiation of negotiable instruments.

Construing the proof offered against the movant and in favor of the party opposing the motion for summary judgment, I find that an issue of fact remains as to whether or not a sale took place. For that reason I respectfully dissent.