54554. BLAU et al. v. REDMOND et al.

WEBB, Judge.
Saul Blau and others enrolled their children in Phoenix Academy, a private school, for which the requisite tuition was paid. In addition, the trustees of the Phoenix Academy, Inc., the school's corporate owner, before acceptance of an enrollment required each pupil's family to intrust them with $1,000 for which an agreement substantially as follows was issued:

"Agreement

"1. The undersigned parent(s) of child (or children) attending Phoenix Academy, Inc. agrees to lend to Phoenix Academy, Inc. the sum of One Thousand Dollars ($1,000), per family, interest free, for so long as any child of the undersigned shall attend said Academy.

"2. The above sum is tendered to Phoenix Academy,

Inc. contemporaneously with the execution of this document by the parent, and Phoenix Academy, Inc. promises to pay to the undersigned One Thousand Dollars ($1,000) within thirty (30) days after notice and demand for payment provided that any and all children of the undersigned shall no longer attend Phoenix Academy, Inc. or any successor to Phoenix Academy, Inc.

"3. It is agreed by Phoenix Academy, Inc. that the above sum and any other such sums which are received by Phoenix Academy, Inc. under terms which are the same or similar to the ones in this document shall be placed in a special account, to be known as Phoenix Academy, Inc. Expansion Fund, separate from the general operating funds of Phoenix Academy, Inc., said sums shall be invested in a savings account and/or certificates of deposit, to be used as hereinafter set forth in Paragraph 4.

"4. The above mentioned special account and any interest or other increment that might accrue shall be used, upon authorization of the Board of Trustees of Phoenix Academy, Inc. or any special committee so appointed by the Board of Trustees, for the purpose of acquiring and developing a new school location and buildings. It is specifically anticipated that without limiting the foregoing, the special account shall be used to: develop a fund-raising program for expansion capital, purchase land or an option on land, engineering studies and other expenses relative to the development of new physical facilities.

"In Witness Whereof, the undersigned parties place their hand and seal this 29th day of July, 1975.

"/s/ Aubrey Redmond (Seal)
Phoenix Academy, Inc. Trustee
"/s/ Saul Blau (Seal)
Parent Saul Blau"

The issuance and execution of such an "agreement" was authorized by the corporate trustees in early 1973, and approximately 81 were issued before April 24, 1975[1]

---

[1] Prior to April 24, 1975, nonprofit corporations were not subject to registration or regulation under the Securities Act of Georgia. By Act approved on that date

and approximately 45 or more[2] after that date. There was no registration by the corporation with the securities commissioner.

Blau's young daughter was accepted for the 8th grade, attended the academy the scholastic year of 1975-1976, and was graduated in May or June, 1976. After several calls requesting return of the $1,000 with no result, Blau by letter of August 4 made demand of the trustees for payment. The only response he received was a letter from counsel for the trustees dated August 13 to "The Parents of Students at Phoenix Academy" that due to financial difficulties the school would not reopen in September, that they were seeking a sale of the school premises,[3] that the school had no funds and that counsel "will contact you regarding repayment of your loan upon sale of the real estate. No funds will be available for such purpose until the sale is actually closed."

On September 16, 1976 the school corporation filed its petition under Chapter XI of the Bankruptcy Act, and on December 8 an order of adjudication was entered by the bankruptcy judge in the United States Court for the Northern District of Georgia.

Prior to the bankruptcy adjudication Blau, on behalf of himself and all others similarly situated, filed on November 4 his two-count complaint against Aubrey Redmond, Dr. Tom D. Raum and James B. Gilmore who are three of the trustees of the academy corporation. Blau alleged in the first count that they had engaged in unlawful practices under the Securities Act of 1973, are thereby subject to the penalties thereunder set forth in Code Ann. § 97-114 in that they sold to him and others

---

the Securities Act became applicable to nonprofit corporations. Ga. L. 1975, pp. 928, 941 (Code Ann. § 97-105 (e)).

[2] Trustees' counsel said approximately 76.

[3] On September 17, 1975 the academy purchased premises at 4146 Chamblee-Dunwoody Road for $300,000, paying to the seller $55,144.27, assuming liens totaling $114,328.71, and executing to seller purchase money notes for $100,000.

securities on forms similar to that hereinabove quoted, without registering them as required by Code Ann. § 97-105, and he sought recovery of the consideration paid as well as punitive damages.

In the second count Blau charged the same defendants with violation of Code Ann. § 22-714 (a) and (b).

Interrogatories were made by Blau, the defendants moved for a summary judgment, and affidavits in opposition to the motion were submitted. The trial judge, after hearing, granted the motion for summary judgment as to count one and denied it as to count two, and granted Blau's motion for a certificate of immediate review. The court's order of April 22, 1977, as to count one reads:

"The Georgia Securities Act, being in derogation of common law, must be strictly construed. Without ruling on whether or not the documents claimed to be securities by Plaintiff are in fact securities, it is the decision of this Court that even if said documents were securities, they would be exempt from registration under the provisions of Georgia Code Ann. § 97-108 (i). This decision is based on the fact that the owners of said documents had this ability and the right to cause said documents to mature in less than nine (9) months. Therefore, Defendant's motion for Summary Judgment is granted as to Count One of Plaintiff's Complaint."

Blau enumerates five alleged errors in his appeal from that judgment, viz., (1) the conclusion that the Georgia Securities Act is in derogation of common law and must be strictly construed; (2) failure to find that the "documents" sued upon were notes or evidences of indebtedness; (3) the conclusion that even if the "documents were securities, they would be exempt from registration under . . . Code Ann. § 97-108 (i)"; (4) the reasoning that the owners had "the right to cause said documents to mature in less than nine (9) months"; and (5) that there are genuine issues to be resolved by the trier of facts.

1. The Georgia Securities Act is remedial in nature, intended for the protection of investors, and is to be broadly and liberally construed to effectuate its aim.

Conversely, its exceptions must be narrowly viewed. *Gilbert v. Meason,* 137 Ga. App. 1, 3 (222 SE2d 835) (1975); *Fortier v. Ramsey,* 136 Ga. App. 203, 206 (220 SE2d 753) (1975); *Jaciewicki v. Gordarl Associates,* 132 Ga. App. 888, 893 (209 SE2d 693) (1974). Consonant with this view is that of the federal courts relative to the Securities Act of 1933 (15 USCA § 77a) and the Securities Exchange Act (15 USCA § 78a). Tcherepnin v. Knight, 389 U. S. 332, 336 (88 SC 548, 19 LE2d 564, 569) (1967); Hill York Corp. v. American International Franchises, Inc., 448 F2d 680, 689 (5th Cir. 1971). The assertion that the Georgia Securities Act must be strictly construed is clearly contrary to established case law and was erroneous.

2. The Georgia Securities Act of 1973 provides: " 'Security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of indebtedness, investment certificate. . ." § 2 (16); Code Ann. § 97-102 (16) (Ga. L. 1973, pp. 1202, 1208). That the instrument executed and issued by and on behalf of Phoenix Academy is an "evidence of indebtedness" cannot be disputed. It may also be termed a "certificate of indebtedness." It provides that Phoenix "promises to pay." "The ordinary terms of 'any note' or 'evidence of indebtedness' are self-defining and require no further definition." *Peoples Bank v. North Carolina Nat. Bank,* 139 Ga. App. 405, 411 (228 SE2d 334) (1976) and cits. The "agreement" on behalf of the corporate academy, whether a "note" or "an evidence of indebtedness," was a "security" within the definition of the Act.

Argument is made that this was not an investment with expectation of profits solely from the efforts of a third party under the "Howey" test, expressed in SEC v. W. J. Howey Co., 328 U. S. 293 (66 SC 1100, 90 LE 1244) (1946), and consequently was not a "security" within the terms of the Act. The "Howey" test of "an expectation of profits" related to an "investment contract." To like effect, Code Ann. § 97-102 (16) relates a return on "risk capital" to "investment contract." The "agreement" here was not an "investment contract" but either an "evidence of indebtedness" or a "certificate of indebtedness."

3. We next consider the conclusion of the trial court that even if the "documents were securities, they would be

exempt from registration under ... Code Ann. § 97-108 (i)" because the owners had "the right to cause said documents to mature in less than nine (9) months."

It is well established that exemptions from the securities laws are to be strictly construed and that one who claims the exemption bears the burden of proving its availability. SEC v. Ralston Purina Co., 346 U. S. 119, 126 (73 SC 981, 97 LE 1494, 1499) (1953); SEC v. M. A. Lundy Associates, 362 FSupp. 226, 231 (D.C., R.I., 1973) and cits.

Section 8 (i) of the Georgia Securities Act exempts from the Act's registration provisions (Code Ann. § 97-105) "promissory notes maturing in not more than nine months from date of issuance; provided that said securities are not offered for sale by means of advertisements publicly disseminated in the news media or through the mails." Code Ann. § 97-108 (i). So does the Securities Act of 1933 exempt from its registration provisions "Any note. . . which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited. . ." 15 USCA § 77c (a)(3). The Securities Exchange Act has a similar 9-month exclusion. 15 USCA § 78c (a) (10).

Most courts have countenanced a literal reading of the definition of security to the extent that almost all notes are held to be securities. *Peoples Bank v. North Carolina Nat. Bank,* 139 Ga. App. 405, 411, supra (cert. den.); SEC v. Continental Commodities Corp., 497 F2d 516, 524 (5th Cir. 1974) and cits. The treatment extended to notes and securities, while not precisely the same under the Georgia Act and the Federal Acts, is virtually identical.

The Federal courts have held that a maturity of less than nine months is not dispositive of the question of exemption from registration. It is the character of the evidence of indebtedness, note, or security, not its maturity date, which determines coverage under the Securities Act. The Fifth Circuit Court in United States v. Rachal, 473 F2d 1338, 1343 (5th Cir. 1973), a case

involving the exemption from registration for short-term notes, approved the following instruction given by the trial court:

"This exemption was intended by Congress to cover that type of commercial paper available for discount at a Federal Reserve Bank, not generally sold to the public or advertised for public sale. It applies only to such notes, usually high quality commercial paper, as arise out of current transactions and are hence covered by assets readily convertible into cash. The exemption does not apply to common capital stock or an instrument which has the characteristics of such stock generally, regardless of what other characteristics it may have." See also Zeller v. Bogue Electric Mfg. Corp., 476 F2d 795, 799 (2d Cir. 1973); SEC v. Continental Commodities Corp., supra, p. 524. In Continental, the court stated regarding its decision in Rachal:

"Underlying our approval [of the trial court's instruction] was the premise that the Acts' exemptions for notes extend only to commercial paper, not investment paper. This premise has received increasing acceptance, as indicated by the number of cases rejecting the proposition that notes of less than 9 months maturity are per se exempt from the registration provisions of the '33 Act and the definitional section of security appearing in the '34 Act. [Cits.] Additional testimony to its approval is supplied by courts which deem the commercial-investment dichotomy as implicit within the 'unless the context otherwise requires' prefatory language of 15 U.S.C. §§ 77b(1) and 78c(a)(10), see Lino v. City Investing Co., 487 F.2d 689, 694-695 (3d Cir. 1973); [cit.], and those courts which read the dichotomy into the definitional sections without positing a precise derivational source. . . . [I]t is the character of the note, not its maturity date, which determines coverage under both the registration provisions of the Securities Act of 1933, and the Securities Exchange Act of 1934."

Assuming arguendo that the documents in this case may be properly termed "notes," it cannot be seriously contended they are that type of commercial paper available for discount at a Federal Reserve bank, and as arise out of current transactions and hence covered by

assets readily convertible into cash. Furthermore, the contention that the maturity of these documents is less than nine months is highly questionable.

The trustees of Phoenix are insistent in their argument, and rather persuasive, that the "agreements" or "documents" in this case are not "notes." We are inclined to agree, although they do embody the words "promise to pay." Each is, however, as heretofore stated, without question an "evidence of indebtedness" and may be termed a "certificate of indebtedness," and as such is a security within the terms of the Security Act. Code Ann. § 97-102 (16), supra. The Act exempts from registration *"promissory notes* maturing in not more than nine months from date of issuance. . ." Code Ann. § 97-108 (i), supra. (Emphasis supplied.) The exemption is explicit as to the type of security, and is indicative that it is applicable to "high quality commercial paper." The exemption relied upon by the trustees does not mention "evidence of indebtedness" or "certificate of indebtedness," but only "promissory notes." The "exempted transactions" enumerated in Code Ann. § 97-102 (16), supra, specifying "promissory notes" only, must be narrowly viewed since the Georgia Securities Act is remedial legislation entitled to a broad construction. See SEC v. Continental Tobacco Co. of S. C., 463 F2d 137, 155 (4) (5th Cir. 1972).

Certainly the "agreements," whether they be "notes," "certificates of indebtedness," or "evidence of indebtedness," do not meet the criteria exposited in Zeller v. Bogue Electric Mfg. Corp., 476 F2d 795, supra, p. 800, that is (1) of prime quality; (2) used to finance current transactions; and (3) discountable at a Federal Reserve bank. We hold that those "agreements" issued on and after April 24, 1975 do not fall within the exemptions specified in Code Ann. § 97-102 (16), and that the trial court in holding otherwise committed error.

On summary judgment the burden was upon the trustees as movants, to pierce the allegations of the complaint and to establish that as a matter of law that the complainant could not recover. *Lindsey v. Crescent Park, Inc.,* 139 Ga. App. 5 (228 SE2d 6) (1976). This they failed to do, there are material issues for the jury, and the trial court erred in granting summary judgment.

*Judgment reversed. Bell, C. J., Deen, P. J., and Shulman, J., concur. McMurray and Banke, JJ., concur in the judgment only. Smith and Birdsong, JJ., dissent. Quillian, P. J., not participating.*

ARGUED SEPTEMBER 8, 1977 — DECIDED OCTOBER 28, 1977 — REHEARING DENIED NOVEMBER 16, 1977 — ▮▮▮▮▮▮▮▮

*J. Nathan Blau, Saul Blau,* for appellants.
*John H. Calhoun, Jr., Clifton S. Fuller, Jr.,* for appellees.

BIRDSONG, Judge, dissenting.

In reversing the grant of summary judgment by the trial court, this court has ruled that an interest-free "loan" (so-characterized by the agreement itself) from the parents of a child attending a private school to the trustees of that school, for the duration of the child's enrollment, constitutes a "security" within the meaning of the Georgia Securities Act of 1973 (Code Ann. § 97-101, et seq. (Ga. L. 1973, pp. 1202-1260)). In reaching this result, the majority reasoned that the above-described agreement was a "note" or "evidence of indebtedness," and, for that reason alone, within the ambit of the Act.

The definitional section of the Act provides, in pertinent part, that, for purposes of the Act, the term "'Security'" means any note. . . evidence of indebtedness, certificate of indebtedness. . ." Code Ann. § 97-102(16). That the Act is to be read flexibly to effectuate its remedial purposes is undisputed. However, despite the "any note" language, the case law is clear that not every note is a security. United Housing Foundation v. Forman, 421 U. S. 837 (95 SC 2051, 44 LE2d 621) (1975); McClure v. First National Bank, 497 F2d 490 (5th Cir. 1974), cert. den., 420 U. S. 930 (95 SC 1132, 43 LE2d 402) (1975). The United States Supreme Court has held that the name given to an instrument is not, alone, dispositive of its character, stating, in United Housing, supra, p. 848:

"We reject at the outset any suggestion that the present transaction, evidenced by the sale of shares called 'stock,' must be considered a security transaction simply

because the statutory definition of a security includes the words 'any . . . stock.' Rather we adhere to the basic principle that has guided all of the Court's decisions in this area:

" '[I]n searching for the meaning and scope of the word 'security' in the Act[s], form should be disregarded for substance and the emphasis should be on economic reality.' Tcherepnin v. Knight, 389 U. S. 332, 336 (1967)."

See also SEC v. W. J. Howey Co., 328 U. S. 293 (66 SC 1100, 90 LE 1244).

Certainly, there is ample authority for the proposition that some "notes" are securities within the meaning of the Act. This court has emphasized the fact that the Act ". . . by its definitions designates 'note' as the very first security." *Peoples Bank v. North Carolina Nat. Bank,* 139 Ga. App. 405, 411 (228 SE2d 334) (1976). Nevertheless, "economic reality" and common sense dictate that not every note or evidence of indebtedness is a security. To so hold would render the courts (state and federal) the guardians of a vast number of makers and payees. Would every simple promissory note from the local bank be subject to the Securities Act? A one-year lease of an apartment is certainly an "evidence of indebtedness"; must the landlord file a registration statement?

The court must determine whether the activity in the case sub judice was the type of behavior intended to be regulated by the securities acts, "remembering that business transactions are not all reducible to a purchase or sale of a security." Woodward v. Metro Bank of Dallas, 522 F2d 84, 91 (5th Cir. 1975). Herpich v. Wallace, 430 F2d 792 (5th Cir. 1970). The court should bear in mind that the primary purpose of the securities acts was to eliminate serious abuses in a largely unregulated securities market, focusing on the "economic reality" that securities are sold to raise capital for profit-making purposes. "Thus, in construing these [securities] Acts against the background of their purpose, we are guided by a traditional canon of statutory construction: '[A] thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.' " United Housing, supra, p. 849.

The United States Supreme Court, and virtually all of the United States Courts of Appeals, have rejected the literal approach taken by the majority today. United Housing, supra, fn. 14, p. 849. Instead, the courts have adhered to the commercial/investment dichotomy test which distinguishes a commercial transaction from "an instrument commonly known as a 'security' " by asking ". . . whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." Howey, supra, p. 301. "The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." United Housing, supra, p. 852. For a lucid exposition of the various tests utilized in defining a "security," see *Jaciewicki v. Gordarl Associates,* 132 Ga. App. 888 (209 SE2d 693) (1974).

None of the above-described elements was present in the instant case. The agreement stipulated that the funds were "loaned" on an interest-free basis; the appellants do not contend, nor could they, that they expected anything more than the return of the original "loan." As to the contention that the appellants anticipated a "profit" in the form of an education for their child, such a "profit" is no more than the average taxpayer receives from the public schools. Such a "benefit" cannot be liquidated into cash; nor does it result from the entrepreneurial utilization of appellants' "loan." In any analysis, the commercial aspects of the transaction plainly outweigh the attenuated "profit" alleged by appellants. In this context, the appellants could not reasonably contend that they believed that their agreement to provide an education for their child was protected by the securities laws.

A careful examination of the facts of this case reveals that appellants were not "investing" in any sense of the word. The "loan" possessed none of the characteristics traditionally associated with a security: negotiability; transferability; voting rights; and it could not appreciate in value. In sum, the agreement to "loan" money in exchange for an education did not represent any of the "countless and variable schemes devised by those who

seek the use of the money of others on the promise of profits." Howey, supra, p. 299, and therefore does not fall within the "ordinary concept of a security."

The literal approach taken by the majority is a drastic extension of the already-broad protections afforded by the Act.

I respectfully dissent.

I am authorized to state that Judge Smith joins in this dissent.